IN THE UNITED STATES DISTRICT COURT
SOTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOREEN BENSON, ) | |
| ) | **COMPLAINT & JURY DEMAND** |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| LEHMAN BROTHERS INC., ) | Civil No.:  04-CV-7323 |
| ) | |
| Defendant. ) | |

Plaintiff, Doreen Benson, by and through the undersigned counsel, and for cause of action against Defendant alleges as follows:

**JURISDICTION AND VENUE**

1. This court's jurisdiction is hereby invoked pursuant to the provisions of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5(f)) (hereinafter, "Title VII") for claims arising from actions in violation of Title VII and by virtue of the court's pendant jurisdiction over the other related claims asserted herein.  The court's jurisdiction is also hereby separately invoked pursuant to the provisions of 28 U.S.C. § 1332 because there is an amount in controversy in excess of $75,000 and there is complete diversity of citizenship between the two parties.

2. The actions alleged herein took place in New York County, State of New York, and venue is, accordingly, appropriate in this court.

**PARTIES**

3. DOREEN BENSON (hereinafter, the "Plaintiff") is a resident of Palm Beach County, State of Florida, and is a "member of a protected class", as those words are defined under Title VII.

4. LEHMAN BROTHERS INC. (hereinafter, the "Defendant") is a Delaware

1

corporation, presently having its principal place of business at 745 Seventh Avenue, New York, New York 10019, and is duly authorized to conduct business in the State of New York and is a "person" as that term is defined under Title VII.

## BACKGROUND FACTS

5.   On or about November 22, 1997, Defendant hired Plaintiff as an Account Executive (hereinafter, "AE") at its New York headquarters, which were then located in the World Financial Center in lower Manhattan.   .

6.   Plaintiff was an "employee", within the meaning of Title VII, of Defendant.

7.   On July 3, 2002, Defendant involuntarily discharged Plaintiff from employment with Defendant.

8.   Plaintiff's responsibilities as an AE were those commonly associated with the role of a "stockbroker"; soliciting, closing and administering securities sales business from prospects and clients.

9.   Plaintiff was one of very few female AE's at Lehman Brothers. Less than 10 of the approximately 400 brokers were women.

10.   The virtual non-representation of women in Lehman's brokerage group was indicative of a pervasive hostility to women in that workplace.

11.   Plaintiff was one of the top performing AE's at Lehman, ranking in the top 15% of all AE's who were working at the Defendant.

12.   Plaintiff was never given the rewards and perks that lowering performing male AE's were granted.

13.   While many of the male AE's were assigned brokerage accounts by the investment banking group and brokerage management, not once did Defendant's management give the Plaintiff an existing account, despite her repeated requests to management for such "referrals".

14. On many occasions, the Plaintiff applied for a share of what were known as "syndicate offerings" so she could sell them to her clients. These were very desirable shares of new stock offerings of which Lehman was one of the underwriting securities firms. Not once was the Plaintiff given a share of these syndicate offerings – thus negatively impacting her income.

15. However, such "syndicate offerings" were routinely granted to male AE's with substantially lower production results than the Plaintiff.

16. Also, management was always much stricter with the Plaintiff than with the male brokers on compliance issues. There were several such incidents.

17. While management was always pushing the male AE's to earn more in commissions, Plaintiff repeatedly heard comments to the effect that she was "making too much money."

18. On or about March 11, 2001 there was a meeting between the Plaintiff's partner, Dr. Walter Gerasimowicz ("Gerasimowicz") and several members of Defendant's management team, including Mark Stevenson ("Stevenson") and Paul Edwards ("Edwards") who was Stevenson's supervisor. At the meeting both Stevenson and Edwards complained that the Defendant was making more money than Gerasimowicz and recommended that the Defendant transfer some of her accounts to him.

19. The Defendant did transfer some of her accounts to her partner so that Gerasimowicz would not be fired. This resulted in the Plaintiff earning less money than she would have otherwise.

20. In 2001, the Plaintiff was involved in a serious automobile accident while she was in Florida. She suffered significant head and back injuries, causing her to be temporarily, partially disabled, and was told by her attending physician not to travel by air for some time. Therefore, she transacted business from her house in Florida for several months.

21. The Defendant later stated that the Plaintiff had no authorization to stay in Florida while she was injured and used this as partial justification for her termination.

22. The Plaintiff did her best to keep management apprized of her travels and whereabouts, but, when, in 2002, the Defendant was seeking to find justification for terminating her, management complained that she had not obtained pre-authorization for some of her travels. In fact, the male AE's traveled constantly without obtaining pre-authorization.

23. Defendant's management consistently made unjustified criticisms and other defamatory statements about the Plaintiff in front of other AE's as well as the administrative staff.

24. After the Plaintiff was terminated, certain members of the Defendant's management made false and defamatory statements to at least two prospective future employers of the Plaintiff, causing her to not be offered those jobs.

25. Management consistently assigned to Plaintiff inexperienced or substandard trading assistants (while assigning the better ones to the male AE's), which made doing her job much more difficult. Management would also transfer away one of her trading assistants without even notifying her. This was typical of the disrespect that management showed her.

26. Management assigned to the Plaintiff, against her requests and wishes, a trading assistant who was not competent, a Mr. Jeff Chalson ("Chalson"). While making out trade tickets, Chalson made numerous disastrous and costly documentation errors to the extent of $75,000. Stevenson insisted that the Plaintiff pay for these errors.

27. This is in contrast to the experience of a male AE in the group who made trading errors in the vicinity of $1,000,000. However, management did not make Mr. Gasparo repay Lehman Brothers for the error, nor did management report the error to the Compliance Dept. within Lehman Brothers as they should have done.

28. On March 28, 2002, the Plaintiff sent a letter to Thomas Russo the Vice Chairman of the Defendant informing him of the discriminatory treatment that had consistently been accorded her by Defendant's management. Management never replied to this letter nor addressed any of her

4

concerns. Shortly thereafter, Defendant's management began an all out campaign of retaliation with the goal to discharge her.

29. The Plaintiff has previously sent a similar letter to Nancy Coleman in Defendant's Human Resources Dept. but not action was taken.

30. On May 30, 2002, Jeff Boyle, Head of Human Resources at the Defendant, held a meeting with the Plaintiff to discuss alleged problems with her business travel not being "pre-approved" and said that this was a "final warning". Plaintiff responded that how could this be a "final warning" when there had been no "initial warning"?

31. This "final warning" was clearly pretextual as a justification to discharge the Plaintiff who had refused to accept invidious treatment and had made formal complaints.

32. Only a few days later, on July 3, 2002, the Defendant terminated the Plaintiff's employment.

33. The Defendant even admits that its decision to terminate the Plaintiff had nothing to do with her production results and that they were "good". In fact, the Plaintiff had previously been told by Stevenson that her numbers were "excellent".

34. It is clear that the Defendant was terminated because she complained about being treated unfairly because of her sex and that her termination was purely done in retaliation against her.

35. The Plaintiff has requested and received from the U.S. Equal Opportunity Employment Commission ("EEOC") a "Notice of Right to Sue".

## FIRST CAUSE OF ACTION

### (TITLE VII – DISPARATE TREATMENT)

36. Plaintiff realleges and incorporates by reference Paragraphs 1 through 35 herein.

37. Defendant treated the Plaintiff invidiously and showed consistent preferential treatment towards the male AE's in her division – even those with dramatically weaker production

records.

38. This disparate treatment caused the Plaintiff to suffer significant loss of income, as well as significant personal embarrassment, over her almost five years tenure at the Defendant.

39. The actions of the Defendant and certain of its managers were taken against the Plaintiff because of her sex, in violation of Title VII and also in violation of the laws of the State of New York and of the City of New York.

40. Under the legal doctrine of *respondeat superior*, Defendant is liable for the tortuous actions of its managers.

41. The actions of the Defendant and certain of its managers caused the wrongful termination of the Defendant, resulting in her suffering lost income and benefits.

42. The actions of the Defendant and certain of its managers were taken in the face of a perceived risk that those actions violated both federal and New York State laws.

43. The actions of the Defendant and those of its mangers have caused the Plaintiff to suffer out-of-pocket expenses, emotional distress, pain, humiliation, embarrassment, anxiety, depression and ridicule all to her general damage.

44. The actions of the Defendant and those of its managers have prevented the Plaintiff from obtaining at least two subsequent AE positions with other securities firms since her discharge from employment with the Defendant.

45. The Defendant's actions and those of its managers were willful and malicious and/or recklessly disregarded the rights of the Plaintiff.

46. As a result of Defendant's actions, the Plaintiff is entitled to an award of punitive damages in addition to her other damages.

## SECOND CAUSE OF ACTION

### (TITLE VII – HOSTILE WORK ENVIRONMENT)

47. Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 and the First Cause of Action herein.

48. Defendant treated the Plaintiff invidiously and showed consistent preferential treatment towards the male AE's in her division – even those with dramatically weaker production records.

49. Plaintiff was excluded from many work functions where the male AE's were invited.

50. Certain managers of the Defendant showed far less respect towards the Plaintiff, front of the administrative staff, than they did for the male AE's. This was both humiliating for the Plaintiff as well as making it harder to obtain appropriate levels of cooperation from the administrative staff.

51. This disparate treatment caused the Plaintiff to suffer significant loss of income, as well as significant personal embarrassment, over her almost five years tenure at the Defendant.

52. The actions of the Defendant and certain of its managers were taken against the Plaintiff because of her sex, in violation of Title VII and also in violation of the laws of the State of New York and of the City of New York.

53. Under the legal doctrine of *respondeat superior*, Defendant is liable for the tortuous actions of its managers.

54. The actions of the Defendant and certain of its managers caused the wrongful termination of the Defendant, resulting in her suffering lost income and benefits.

55. The actions of the Defendant and certain of its managers were taken in the face of a perceived risk that those actions violated both federal and New York State laws.

56. The actions of the Defendant and those of its mangers have caused the Plaintiff to

7

suffer out-of-pocket expenses, emotional distress, pain, humiliation, embarrassment, anxiety, depression and ridicule all to her general damage.

57. The actions of the Defendant and those of its managers have prevented the Plaintiff from obtaining at least two subsequent AE positions with other securities firms since her discharge from employment with the Defendant.

58. The Defendant's actions and those of its managers were willful and malicious and/or recklessly disregarded the rights of the Plaintiff.

59. As a result of Defendant's actions, the Plaintiff is entitled to an award of punitive damages in addition to her other damages.

## THIRD CAUSE OF ACTION

## (TITLE VII - RETALIATION)

60. Plaintiff realleges Paragraphs 1 through 59 and the First and Second Causes of Action and incorporates the same by reference herein.

61. In violation of Title VII and the laws of the State of New York and the City of New York, certain managers of the Defendant retaliated against the Plaintiff for her having formally notified and complained to senior managers of the Defendant about the invidious treatment she had received for over four years as a female AE. This retaliation took the form of almost daily harassment and, three months later, termination.

62. The Defendant is therefore liable for damages relating to the injury to the Plaintiff's reputation, loss of employment, loss of income and benefits and loss of certain future employment opportunities.

63. The actions of the Defendant and certain of its managers were willful and malicious and/or recklessly disregarded the rights of the Plaintiff.

64. As a result of the Defendant's actions, the Plaintiff is entitled to punitive damages in

addition to her other damages.

## FOURTH CAUSE OF ACTION

### (FALSE LIGHT)

65. Plaintiff realleges Paragraphs 1 through 64 and the First, Second and Third Causes of Action and incorporates the same by reference herein.

66. The Defendant's actions have intentionally portrayed the Plaintiff in a false light to her co-workers and to her clients and future prospective employers.

67. The Defendant's portrayal of the Plaintiff in a false light was of a nature which a reasonable person would find unconscionable and highly offensive.

68. The Defendant is therefore liable for damages relating to the injury to the Plaintiff's reputation, loss of employment, loss of income and benefits and loss of certain future employment opportunities.

69. The actions of the Defendant and certain of its managers were willful and malicious and/or recklessly disregarded the rights of the Plaintiff.

70. As a result of the Defendant's actions, the Plaintiff is entitled to punitive damages in addition to her other damages.

## FIFTH CAUSE OF ACTION

### (DEFAMATION)

71. Plaintiff realleges Paragraphs 1 through 70 and the First, Second, Third and Fourth Causes of Action and incorporates the same by reference herein.

72. During her employment, Defendant accused Plaintiff of, without limitation, having supervision problems with various of her Trading Assistants and also of having customer service problems.

75. These statements were false and defamatory and constitute defamation *per se*.

76. These statements were negligently or intentionally communication to the Plaintiff's co-workers, clients and, after her termination, future employers.

77. The Defendant is therefore liable for damages relating to the injury to the Plaintiff's reputation, loss of employment, loss of income and benefits and loss of future employment opportunities.

78. The actions of the Defendant and those of certain of its managers were willful and malicious and/or recklessly disregarded the rights of the Plaintiff.

79. As a result of the actions of the Defendant, Plaintiff is entitled to punitive damages in addition to her other damages.

## **JURY DEMAND**

The Plaintiff demands that the claims alleged herein be tried by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays judgment against the Defendant in an amount greater than Seventy-Five Thousand Dollars ($75,000.00) as follows:

1. For the Plaintiff's lost wages and other benefits;

2. For the Plaintiff's damages arising as of result of damage to her reputation, as well as how such damage prevented her from obtaining future employment, in such amounts as may be shown by proof and the time of trial;

3. For damages under Title VII for emotional and other general damages as may be shown at the time of trial;

4. For Plaintiff's reasonable attorney's fees pursuant to Title VII;

5. For punitive damages as may be shown at the time of trial; and

6.      For interest on the foregoing, costs of court and other such relief as the court deems just and equitable.

Dated this 14th day of September, 2004

**LEWIS D. THOMPSON**

---

Lewis D. Thompson
P.O. Box 403
Summit, New Jersey 07902-0403
(908) 273-0992
(908) 277-0404 Facsimile
Email:  NJLAW6@aol.com

**Counsel for Plaintiff**

11